## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MUSA ALARAIDAH, derivatively on behalf of
ALTIMMUNE, INC.,

c/o Timothy Brown Esq.
The Brown Law Firm, P.C.
767 Third Avenue, Suite 2501
New York, NY 10017

     *Plaintiff*,

     v.

ALTIMMUNE, INC.,
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

     Serve on:
     NATIONAL REGISTERED AGENTS,
     INC.
     1209 Orange Street
     Wilmington, DE 19801

     *Nominal Defendant*,

and

VIPIN K. GARG
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

MATTHEW SCOTT HARRIS
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

DAVID J. DRUTZ
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S

**C.A. No.** 8:25-cv-03223

**DEMAND FOR JURY TRIAL**

Gaithersburg, MD 20878

and

JOHN M. GILL
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

PHILIP HODGES
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

DIANE K. JORKASKY
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

WAYNE PISANO
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

MITCHEL SAYARE
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

KLAUS O. SCHAFER
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

and

CATHERINE ANGELL SOHN
c/o Altimmune, Inc.
910 Clopper Road, Suite 201S
Gaithersburg, MD 20878

    *Defendants*.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Musa Alaraidah ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Altimmune, Inc. ("Altimmune" or the "Company"), files this Verified Shareholder Derivative Complaint against Vipin K. Garg ("Garg"), Matthew Scott Harris ("Harris"), David J. Drutz ("Drutz"), John M. Gill ("Gill"), Philip Hodges ("Hodges"), Diane K. Jorkasky ("Jorkasky"), Wayne Pisano ("Pisano"), Mitchel Sayare ("Sayare"), Klaus O. Schafer ("Schafer"), and Catherine Angell Sohn ("Sohn") (collectively, the "Individual Defendants," and together with Altimmune, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Altimmune, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Garg and Harris for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Altimmune, legal filings, news reports, securities analysts' reports and

advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 10, 2023 to June 25, 2025, both dates inclusive (the "Relevant Period").

2.      The Company is a Delaware corporation that describes itself as a "clinical stage biopharmaceutical company focused on developing treatments for obesity, metabolic and liver diseases." The Company's leading product candidate, as per the Form 10-K the Company filed with the SEC for 2024 on February 27, 2025 (the "2024 10-K"), is pemvidutide, formerly known as ALT-801. Pemvidutide is a novel investigational peptide-based GLP-1 and glucagon dual receptor agonist which the Company is developing to treat obesity and metabolic associated steatohepatitis ("MASH"). The Company hopes pemvidutide will mimic the "complementary effects of  diet and exercise on weight loss, with GLP-1 suppressing appetite and glucagon increasing energy expenditure," while also leading to rapid reductions in liver fat content and serum lipids.

3.       Throughout the Relevant Period, the Individual Defendants repeatedly made or caused the Company to make false and/or misleading representations regarding the odds that pemvidutide will successfully pass clinical trials, as well as pemvidutide's actual results in the Company's IMPACT Phase 2b MASH trial (the "MASH trial"). Leading up to, during, and subsequent to the completion of the MASH trial, the Individual Defendants repeatedly boasted to the investing public of the likelihood of success of pemvidutide and of their encouraging testing

and research results with respect thereto. Critically, the Individual Defendants continued to do so even as the MASH trial only saw pemvidutide successfully reach one of its two primary endpoints, the other achieving no statistically significant results.

4.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the confident remarks made prior to the publishing of the MASH trial results were not based in fact; (2) despite touting the success MASH trial, pemvidutide had shown no statistically significant results for one of its two primary endpoints; and (3) because of this failure, the Company's statements that it hoped for even better results in Phase 3 trials were not based in fact. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

5.    The truth emerged on June 26, 2025, when Altimmune issued a press release announcing the results of the MASH trial for pemvidutide. The results revealed a failure to achieve statistical significance in the analysis of the fibrosis reduction primary endpoint in the MASH trial. Notably, even though there was a positive trend in fibrosis improvement, the statistical significance endpoint was not met as the result of a higher-than-expected placebo response rate.

6.    That same day, the Company also hosted a special call with investors and analysts to discuss those results. Unable to quell skepticism any longer, the Individual Defendants faced direct questions about the implications of the trial results for pemvidutide's future, of which they were able to proffer little more than assurances that they hoped to achieve statistical significance

with respect to the missed endpoint from the MASH trial in a Phase 3 clinical trial. The Individual Defendants did not elaborate as to how they expected the Phase 3 trial to produce differing results, or the basis for their optimism.

7.    On this news, the price per share of the Company's common stock fell $4.10, or 53.2%, from a closing price of $7.71 on June 25, 2025 to $3.61 on June 26, 2025.

8.    The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein, while, in further breach of their fiduciary duties, three of the Individual Defendants simultaneously sold a combined 108,594 shares of Company common stock on inside information for approximate combined proceeds of $842,274.

9.    In light of the Individual Defendants' misconduct—which has subjected the Company; its Chief Executive Officer ("CEO") and President; and Chief Medical Officer ("CMO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Maryland (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

10.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and

misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO, President, and CMOs' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of Altimmune. Plaintiff has continuously held Altimmune common stock at all relevant times.

**Nominal Defendant Altimmune**

17.     Altimmune is a Delaware corporation with its principal executive offices at 910 Clopper Road, Suite 201S, Gaithersburg, MD 20878. Altimmune's common stock trades on the NASDAQ under the ticker symbol "ALT."

**Defendant Garg**

18.     Defendant Garg has served as Altimmune's CEO, President, and as a director since November 2018.

19.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Garg made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| January 30, 2024 | 11,697 | $9.80 | $114,631 |
| February 1, 2024 | 7,313 | $9.88 | $72,252 |
| February 2, 2024 | 8,376 | $9.32 | $78,064 |
| January 25, 2025 | 18,157 | $6.98 | $126,736 |
| January 30, 2025 | 11,701 | $7.00 | $81,907 |
| February 1, 2025 | 15,513 | $6.64 | $103,006 |

Thus, in total, before the fraud was exposed, Defendant Garg sold 72,757 shares of Company stock on inside information, for which he received approximately $576,597 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

20.     The Company's Schedule 14A filed with the SEC on August 15, 2025 (the "2025 Proxy Statement") stated the following about Defendant Garg, in relevant part:

*Vipin K. Garg, Ph.D.* (*68*) currently serves as our President and Chief Executive Officer and is a member of the Board of Directors. Dr. Garg joined Altimmune in November 2018 with over three decades of experience in the biotechnology and pharmaceutical industries. He has a proven track record of building and managing both private and publicly traded companies. Before joining Altimmune, from October 2013 to June 2018, he served as President and Chief Executive Officer of Neos Therapeutics, Inc. (since acquired by Aytu BioPharma, Inc. (Nasdaq: AYTU)), where he built a NASDAQ-listed commercial-stage biopharmaceutical company, launching three branded therapeutic products including Adzenys XR ODT™ and Cotempla XR-ODT™, the first ever XR-ODT medications for the treatment of ADHD. Prior to Neos, he served as president and Chief Executive Officer of Tranzyme Pharma where he progressed a discovery-stage, emerging biotech company to a Nasdaq-listed clinical-stage, drug development company. Prior to joining Tranzyme, Dr. Garg served as Chief Operating Officer of Apex Bioscience, Inc. (acquired by Curacyte AG of Munich, Germany), and held senior management positions at DNX Bio-Therapeutics, Inc. (until its acquisition by Baxter Healthcare Corporation), Sunovion Pharmaceuticals, Inc. (formerly known as Sepracor Inc., now a subsidiary of Sumitomo Dainippon Pharma), and Bio Response Inc. (acquired by Baxter Healthcare Corporation). Dr. Garg received his Ph.D. in Biochemistry in 1982 from the University of Adelaide, Australia, and his M.S. from IARI Nuclear Research Laboratory, New Delhi, India in 1978. We believe that Dr. Garg's extensive experience in the biotechnology and pharmaceutical industries, including his success in scaling companies from early stage development to commercial launch, navigating regulatory environments combined with his scientific expertise, makes him well qualified to serve as a member of our Board of Directors to help drive innovation, strategic growth and stockholder value.

### Defendant Harris

21.     Defendant Harris has served as the Company's CMO since 2019.

22.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Harris made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 30, 2024 | 2,709 | $9.80 | $26,548 |
| February 1, 2024 | 1,801 | $9.88 | $17,794 |

| February 2, 2024 | 2,332 | $9.32 | $21,734 |
| January 25, 2025 | 4,994 | $6.98 | $34,858 |
| January 30, 2025 | 3,173 | $7.00 | $22,211 |
| February 1, 2025 | 2,109 | $6.64 | $14,004 |
| February 2, 2025 | 2,708 | $6.64 | $17,981 |

Thus, in total, before the fraud was exposed, Defendant Harris sold 19,826 shares of Company stock on inside information, for which he received approximately $155,130 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.     The Company's website maintains dedicated pages with biographies of its senior named executive officers.[1] The Company webpage for Defendant Harris states the following:

> Scott Harris has served as Chief Medical Officer of Altimmune since 2019. He has 20 years of experience of development in gastroenterology, hepatology and metabolism therapeutics. He co-founded Lyric Pharmaceuticals in 2015, where he raised a $20.8 M Series A financing round and served as its Chief Medical Officer. Dr. Harris also served as Chief Medical Officer of Avaxia Biologics and Ocera Therapeutics, and he headed clinical development at Napo Pharmaceuticals, where he authored the ADVENT study, the first Phase 2/3 adaptive trial to result in a drug approval (Mytesi®, 2012). Dr. Harris has an MD from Harvard Medical School. He completed medical residencies at John Hopkins Hospital and the University of Pennsylvania and a Gastroenterology and Hepatology Fellowship at Yale University School of Medicine. He has served on the scientific advisory boards of multiple companies and holds a seat on the faculty of Georgetown University School of Medicine, where he teaches a graduate course in drug development.

**Defendant Drutz**

24.     Defendant Drutz served as a Company director from May 2017 through September of 2024. Prior to that, Defendant Drutz also served as a director of Altimmune beginning in 2010

---

[1] https://altimmune.com/team/m-scott-harris-m-d.

prior to its going public via a merger in 2017, and was at one time the Company's pre-merger

Board Chairman.

25.    During the Relevant Period, while the Company's stock price was artificially

inflated and before the scheme was exposed, Defendant Drutz made the following sales of

Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 19, 2024 | 16,011 | $9.91 | $110,547 |

Thus, in total, before the fraud was exposed, Defendant Drutz sold 16,011 shares of Company

stock on inside information, for which he received approximately $110,547 in proceeds. His

insider sales, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrate his motive in facilitating and

participating in the scheme.

26.    The Company's Schedule 14A filed with the SEC on August 16, 2023 (the "2023

Proxy Statement") stated the following about Defendant Drutz, in relevant part:

*David J. Drutz, M.D.* (*85*) has served as a member of our Board of Directors since
May 2017, when he was appointed to the Board in connection with the completion
of the Merger. Dr. Drutz was first elected to Private Altimmune's Board of Directors
in January 2010 and was elected Board Chairman in October 2011. Dr. Drutz is the
President of Pacific Biopharma Associates, LLC, a biopharmaceutical consulting
company that he founded in 1999. From 2008 to 2015, he held various positions at
DARA BioSciences (Nasdaq: DARA), an oncology supportive care company
which was acquired by Midatech Pharma plc, including Director, Chief Executive
Officer, Executive Chairman and Chief Medical Officer. He also previously served
as Chairman of Tranzyme Pharma (Nasdaq:TZYM) from 2000 to 2010; and
Director of MethylGene (TSX:MYG) from 2000 to 2010 and Gentris Corporation
from 2007 to 2014. From 1999 to 2008 he was a general partner with Pacific Rim
Ventures, a Tokyo-based venture capital firm. Dr. Drutz's management experience
includes tenures as VP Biological Sciences and VP Clinical Research at Smith
Kline & French Laboratories; VP Clinical Development at Daiichi Pharmaceutical
Corporation; and CEO of Inspire Pharmaceuticals (1995 – 1998) and Sennes Drug
Innovations (1994 – 1995). Earlier, Dr. Drutz was Professor of Medicine, Chief of
the Division of Infectious Diseases, and the founder of the NSF Center for Cell

Regulation at the UT Health Science Center, San Antonio. Dr. Drutz received his M.D. from the University of Louisville School of Medicine and postgraduate training in internal medicine and infectious diseases at Vanderbilt University School of Medicine, serving subsequently as a research medical officer in the U.S. Navy (LCDR, USNR). We believe Dr. Drutz's significant experience in biotechnology investment and as a physician make him well qualified to serve as a member of our Board of Directors.

**Defendant Gill**

27.     Defendant Gill has served as a Company director since August 2004, and additionally serves as a member of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

28.     The 2025 Proxy Statement stated the following about Defendant Gill:

*John M. Gill* (*71*) has served as a member of our Board of Directors since August 2004. Mr. Gill served as PharmAthene's President and Chief Executive Officer from March 2015 until the completion of the Merger in May 2017. From 2003 to 2013, Mr. Gill served as the President, Chief Executive Officer, co-founder and a Director of TetraLogic Pharmaceuticals Corporation, a public biopharmaceutical company. Mr. Gill has previously held positions at 3-Dimensional Pharmaceuticals and SmithKline Beecham. After serving in the United States Marine Corps, Mr. Gill earned a B.A. in Accounting and Economics from Rutgers University. We believe Mr. Gill's executive and board experience in the pharmaceutical industry and his substantial financial knowledge and expertise make him well qualified to serve as a member of our Board of Directors.

**Defendant Hodges**

29.     Defendant Hodges has served as a Company director since May 2017, and additionally serves as a member of the Compensation Committee and Chair of the Audit Committee.

30.     The 2025 Proxy Statement stated the following about Defendant Hodges:

*Philip L. Hodges* (*55*) has served as a member of our Board of Directors since May 2017, when he was appointed to the Board in connection with the completion of the Merger, and was first elected to Private Altimmune's board of directors in September 2003. Mr. Hodges is Managing Partner of Redmont Capital, a private equity firm located in Birmingham, Alabama, which he joined at its inception in 1997. Redmont Capital is a co-founder of Private Altimmune. Mr. Hodges' investment strategy is focused on high-growth small businesses within the health care, life science and technology sectors. He currently serves as a director for several of the firm's portfolio companies. Mr. Hodges holds a Bachelor of Science

in Business Administration from the Brock School of Business at Samford University. We believe Mr. Hodges [sic] experience as a life science investor makes him well qualified to serve as a member of our Board of Directors.

**Defendant Jorkasky**

31.    Defendant Jorkasky has served as a Company director since May 2020, and additionally serves as a member of the Compensation Committee.

32.    The Company's Corporate Governance page states the following about Defendant Jorkasky:

*Diane Jorkasky, M.*D. (73) has served as a member of our Board of Directors since May 2020. Dr. Jorkasky currently serves as a member of the board of directors of Alzheon, Inc., a private biopharmaceutical company, since 2016. She also served on the board of directors of Q Therapeutics, Inc. from September 2013 until August 2016. From June 2014 to August 2019, she served as Executive Vice President, Chief Medical Officer and Head of Development at Complexa Inc., a clinical stage biopharmaceutical company. Dr. Jorkasky received her M.D. in 1977 from the University of Pennsylvania School of Medicine and is board certified in internal medicine, nephrology and clinical pharmacology. She is a member of the Connecticut Academy of Science and Technology. Dr. Jorkasky is on the faculties of University of California, San Francisco, and Uniformed Service of Health Sciences Medical Schools, with previous faculty appointments at Yale University and the University of Pennsylvania Schools of Medicine. We believe Dr. Jorkasky's career as a physician combined with her and extensive executive leadership in clinical development, regulator strategy and translational medicine at both emerging and large pharmaceutical companies, as well as her academic appointments at leading medical institutions and board experience, makes her well qualified to serve as a member of our Board of Directors to provide strategic guidance across clinical innovation, scientific rigor and governance.

**Defendant Pisano**

33.    Defendant Pisano has served as a  Company director  since August 2018, and additionally serves as the Chair of the Nominating and Corporate Governance Committee.

34.    The 2025 Proxy Statement stated the following about Defendant Pisano, in relevant part:

*Wayne Pisano (70)* has served as a member of our Board of Directors since August 2018. Mr. Pisano also has served on the board of directors of Oncolytics Biotech Inc. (Nasdaq: ONCY), a biotechnology company, since May 2013. Mr. Pisano served on the board of directors of Provention Bio, Inc. (Nasdaq: PRVB), a

biopharmaceutical company, from April 2018 until April 2023 when it was acquired by Sanofi, and IMV INC. (Nasdaq: IMV) a biopharmaceutical company from October 2011 until March 2021. Mr. Pisano served as president and Chief Executive Officer of VaxInnate Corporation, a biotechnology company, from January 2012 until November 2016. Mr. Pisano joined Sanofi Pasteur in 1997 and was promoted to President and Chief Executive Officer in 2007, the position he successfully held until his retirement in 2011. He has a Bachelor of Science in biology from St. John Fisher College, New York and an MBA from the University of Dayton, Ohio. We believe Mr. Pisano's depth of experience across the spectrum of global vaccine development, public immunization policy and commercial operations - both at large pharmaceutical companies and emerging biotech companies, combined with his experience in strategic pipeline advancement and board governance makes him well qualified to serve as a member of our Board of Directors to help guide our growth through innovation and market access

**Defendant Sayare**

35.     Defendant Sayare has served as a Company director since April 2010, and additionally serves as a member of the Audit Committee. Previously, Defendant Sayare served as Chairman of the Board from January 2018 until August 12, 2025.

36.     The 2025 Proxy Statement stated the following about Defendant Sayare, in relevant part:

*Mitchel Sayare, Ph.D. (77*) has been a member of the Board of Directors since April 2010. Dr. Sayare became Chairman of the Board in January 2018 and served as Chairman of the Board until August 12, 2025. Dr. Sayare also served as Executive Chairman from June 2018 to November 2018. Until 2010, Dr. Sayare served as the Chairman of the Board of public company ImmunoGen, Inc. (Nasdaq: IMGN) (a position he had held since 1989). In addition, he served as ImmunoGen's Chief Executive Officer from 1986 to December 31, 2009, and as its President from 1986 to 1992, and from 1994 to July 2008. Prior to joining ImmunoGen, he served as Vice President of Development of Xenogen from 1982 to 1985. Prior to that he was Assistant Professor of Biophysics and Biochemistry at the University of Connecticut. Dr. Sayare earned a Ph.D. in biochemistry from Temple University School of Medicine. Dr. Sayare is chairman of the boards of directors of AutoIVF, Inc. and of MassPay Holdings, Inc., and is a director of Energesis, Inc. and Advanced Aesthetic Technologies, Inc., all privately-held companies. We believe that Dr. Sayare's scientific expertise, leadership in the and substantial governance experience as a board member and executive officer of biotechnology companies makes him well qualified to serve as a member of our Board of Directors to help guide strategic decisions across clinical development, partnerships and corporate growth.

**Defendant Schafer**

37. Defendant Schafer has served as a Company director since May 2017, and additionally serves as a member of the Audit committee, and as a member of the Compensation Committee. Defendant Schafer served as a director of Altimmune prior to its merger, when it was still a private company, from 2012 to 2017.

38. The 2025 Proxy Statement stated the following about Defendant Schafer, in relevant part:

*Klaus O. Schafer, M.D., MPH, (75*) has served as a member of our Board of Directors since May 2017, upon completion of the Merger. Dr. Schafer was first elected to Private Altimmune's Board of Directors in 2012. Dr. Schafer has over 35 years of healthcare leadership experience, having held senior positions in government and industry. As former, Acting Deputy Assistant to the Secretary of Defense for chemical and biological defense, Dr. Schafer oversaw the Department's $1.0 billion program for vaccine, therapeutics, medical device and sensor development and was instrumental in advancing research into human immune response. As former U.S. Air Force Assistant Surgeon General, Dr. Schafer managed all aspects of large integrated health care delivery systems, from clinical care, administration of clinics and hospitals, and oversaw large S&T portfolios, including clinical trials. Dr. Schafer served as CEO and co-founder of TessArae LLC, a biotech medical sequencing device company and Chief Medical Officer and client executive for health at CACI International. Dr. Schafer has been an independent consultant since 2002 serving a number of biotech and health-related company advisory boards and Tadpole Ventures, a private venture capital firm. Dr. Schafer earned his M.D. degree at the University of Iowa, medical boards in family practice and aerospace medicine in the Air Force, Master of Public Health at the University of Texas, and a Master of Science at the Dwight D. Eisenhower School of National Security and Resource Strategy. Dr. Schafer is CERT certified in Cybersecurity Oversight from the Carnegie Mellon University Software Engineering Institute. We believe Dr. Schafer's broad experience across multiple aspects of the healthcare, pharmaceutical development industries, including clinical operations, pharmaceutical development and emerging technologies as well as his extensive leadership in the government and strategic insight into biodefense, innovation and healthcare systems, makes him well qualified to serve as a member of our Board of Directors and to contribute valuable insights into innovation, risk management and growth through the Company's development stages.

**Defendant Sohn**

39.     Defendant Sohn has served as a Company director since 2023, and serves as Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee.

40.     The 2025 Proxy Statement stated the following about Defendant Sohn, in relevant part:

> Catherine Sohn, Pharm D. (70) has served as a member of our Board of Directors since March 2023. Dr. Sohn also serves on the board of directors of Jazz Pharmaceuticals plc, a public commercial-stage biopharmaceutical company, since July 2012, on the board of directors of Axcella Health Inc, a public clinical-stage biopharmaceutical company, since August 2019, and on the board of directors of Maze Therapeutics, a private clinical-stage biopharmaceutical company, since July 2021. Dr. Sohn was formerly senior vice president of worldwide business development, and a member of the global executive committee at GlaxoSmithKline's Consumer Healthcare division, where she led U.S. and global transactions. Since retiring from GlaxoSmithKline, Dr. Sohn has advised CEOs and boards of private life science companies on strategy, strategic product development, partnering, mergers and acquisitions, commercialization of new medicines and vaccines and culture, in her role as President of Sohn Health Strategies. Dr. Sohn received her Doctor of Pharmacy degree from the University of California, San Francisco, a Corporate Directors Certificate from Harvard Business School, a Certificate of Professional Development from Wharton, a Certificate from Berkley Law for environmental, social and corporate governance, and is a Certified Licensing Professional Emeritus. Dr. Sohn is also an Adjunct Professor at the University of California, San Francisco. We believe that Dr. Sohn's extensive experience in the biopharmaceutical industry and as a physician make her well qualified to serve as a member of our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers, directors, and/or fiduciaries of Altimmune and because of their ability to control the business and corporate affairs of Altimmune, the Individual Defendants owed Altimmune and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Altimmune in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Altimmune and its shareholders so as to benefit all shareholders equally.

42.     Each director and officer of the Company owes to Altimmune and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Altimmune, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     To discharge their duties, the officers and directors of Altimmune were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Altimmune, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised a majority of Altimmune's Board at all relevant times.

46.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.    To discharge their duties, the officers and directors of Altimmune were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Altimmune were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Maryland, and the United States, and pursuant to Altimmune's own Code of Business Conduct and Ethics Policy (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Altimmune conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Altimmune and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Altimmune's operations would comply with all applicable laws and Altimmune's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.    Each of the Individual Defendants further owed to Altimmune and the shareholders the duty of loyalty requiring that each favor Altimmune's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Altimmune and were at all times acting within the course and scope of such agency.

50.    Because of their advisory, executive, managerial, directorial, and controlling positions with Altimmune, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Altimmune.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Altimmune was

a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Altimmune and was at all times acting within the course and scope of such agency.

## ALTIMMUNE'S CODE OF ETHICS

57.    Altimmune's Code of Ethics states that the Company's core principles include compliance "with the letter and spirit of the laws and regulations applicable to [its] business;" "[a]void[ing] actual or perceived conflicts of interest;" "[p]rotect[ing] [its] corporate assets and the confidential information of those with whom [Altimmune] does business;" "[b]e[ing] honest, fair and trustworthy;" and "[m]aintain[ing] a corporate culture that values and nurtures ethical conduct at all levels of the organization." To this end, the Code of Ethics makes clear that it applies to "all Company Personnel and Business Partners," and imposes upon all such persons the "responsibility to report any known or suspected violations of this Code."

58.    In the section titled "Compliance with Laws and Regulations," the Code of Ethics states:

> Complying with applicable laws and regulations, both in letter and in spirit, is the foundation on which this Company's ethical standards are built. All Company

Personnel and Business Partners, while conducting business and services as part of, and in connection with, the Company, must comply with the laws, rules, and regulations applicable to the Company's operations in the cities, states and countries in which we operate. These include, without limitation, laws covering bribery and kickbacks; fraud or theft; copyrights; trademarks and trade secrets; information privacy; insider trading; illegal political contributions; antitrust prohibitions; foreign corrupt practices; offering or receiving gifts; environmental hazards; discrimination, harassment, or retaliation; occupational health and safety; false or misleading financial information; or misuse of corporate assets.

Although not all Company Personnel and Business Partners are expected to know the details of all applicable laws, rules, and regulations, it is important to know enough of those that apply to your job position, role, or responsibilities, and to determine when to seek advice from supervisors, managers or other appropriate management personnel.

59.    Furthermore, in the section titled "Ethical Conduct," the Code of Ethics states that:

Beyond compliance with laws, the Company requires that all Company Personnel act in a manner which meets the highest standards of ethical behavior. This includes the obligation to avoid any actual or apparent conflicts of interest in personal and professional relationships that may have an impact on the Company. The honesty and integrity of the Company's business conduct must not be compromised. The Company will not condone ethical violations for the sake of personal gain, personal advantage, expediency, or perceived business advantage.

60.    The Code of Ethics also contains a section entitled "Insider Trading," which states

as follows:

In the course of working for or with the Company, you may come into contact with inside information about the Company that requires special handling and discretion. Inside information is non-public information about the Company that, if made public, would affect the price of the Company's securities. Employees must never use inside information to obtain any type of personal advantage. For more information regarding compliance with insider trading rules and regulations, please refer to our separate Insider Trading Policy.

In addition, no Company Personnel or Business Partner, who, in the course of working for or with the Company, learns of any material, nonpublic information about an entity with which the Company does business (e.g., a customer, supplier, licensor/licensee or other party with which the Company is negotiating a transaction, such as an acquisition, investment or sale), may not trade in that entity's securities until the information becomes public or is no longer material. This remains true even in the event that you are no longer working with or for the Company, or the Company no longer maintains a relationship with the third party.

61.    In the section titled "Scientific Integrity," the Code of Ethics states that:

Research integrity is fundamental to the scientific process and to the Company's ability to help bring novel products to market. All research and development must be conducted according to applicable laws and regulations and to the generally accepted ethical standards of the scientific community.

Scientific misconduct, such as fabrication, falsification, or plagiarism in proposing, conducting or reporting research, which disregards the intellectual contributions and property of others, impedes the progress of research, and corrupts the scientific record is prohibited.

62.     The Code of Ethics also addresses the issue of public disclosure. In the Section

"Company Records," the Code of Ethics states:

We are required under U.S. federal securities laws to provide the public with periodic and timely disclosure of accurate and complete information regarding our business, financial position, and results of operations (such as quarterly and annual reports and materials for our annual shareholders' meeting). We provide additional disclosures to the public through our quarterly earnings calls and press releases. We are required under generally accepted accounting principles to keep books, records, and accounts that accurately reflect all transactions and to provide an adequate system of internal controls. Our financial statements must present fairly our financial position, and results of operations. Therefore, the books, financial records, and the related supporting data must completely and accurately describe all of our transactions without the omission, concealment, mischaracterization, or falsification of any information.

We are committed to maintaining an internal control system sufficient to provide timely and accurate recording and reporting of financial information. The Company's officers, directors, and any personnel who exercise supervisory duties are responsible for developing and maintaining an adequate system of internal control within their departments, organizations, and subsidiaries.

Compliance with the Company's policies and procedures that may directly or indirectly affect the accuracy and reliability of our financial information, accounting records, and the related supporting data and documents is the responsibility of all Company Personnel. All Company Personnel must ensure not to unduly or fraudulently influence, coerce, manipulate, or mislead any authorized audit or interfere with any auditor engaged in the performance of an internal or independent audit of our financial statements, accounting books and records, or internal control. Any transaction, payment, or entry that is known to violate these standards must be disclosed immediately to the CFO.

Company records include contracts, customer orders, invoices, shipping documents, employee information, personnel and records, travel and expense reports, financial system information, emails, electronic data files, preclinical studies and clinical trial results, and all other records maintained in the ordinary

23

course of our business. Accurate, objective, fair, relevant, timely, and complete books and records are essential for our operations and allow us to meet our obligations to Company Personnel, Business Partners, shareholders, customers, and various governmental agencies. No undisclosed or unrecorded fund or assets should be established for any purpose. Payments and transactions without appropriate supporting documentation and approval are prohibited. For example, only the true and actual number of hours worked should be reported. Employees may file for business expense reimbursement, which must be documented and recorded accurately.

Business records and communications often become public and officers and employees should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos and formal reports. Records and documents should always be retained or destroyed according to the document and record management policies and record retention procedures.

63.    Under the section titled "Release of Company Information," the Code of Ethics states the following:

Because of the importance of the legal requirements regarding disclosure of certain information to our shareholders and investors, we must make certain that any information regarding our business, financial condition, or operating results that is released to the public is accurate and consistent. As a result, you should not discuss internal Altimmune matters with anyone outside of Altimmune except as clearly required in the performance of your job duties. This prohibition applies particularly to inquiries about Altimmune made by the news media, securities analysts, brokers or traders, and individual shareholders or investors. All responses to these inquiries must be made only by the Company's CEO, CFO, or their delegates. If you receive inquiries from these sources, you should immediately refer them to the Company's CEO or CFO.

Non-public information that reasonably could be considered to be material information about the Company must be approved for release only by the CEO, CFO, or their delegates. Certain non-public information related to Altimmune's business may not affect Altimmune or Altimmune's stock price, but may affect the stock price of another entity or the value of other investment opportunities. You may neither use such information to gain personal benefit nor tip off another person or entity to act, whether or not for your personal benefit.

64.    In the section titled "Reporting Violation of the Code," the Code of Ethics states, in relevant part:

All Company Personnel and Business Partners have a duty and obligation to report any known or suspected violation of this Code, including violations of the laws, rules, regulations, or policies that apply to the Company, or suspected improper

accounting, auditing, or internal control matters. Any Company Personnel or Business Partner who becomes aware of any violation or suspected violation, or reasonably believes that there has been a material violation of this Code, should report it immediately to your manager. If you do not feel comfortable reporting the conduct to your manager, or you do not get a satisfactory response, you may contact the Company's CEO or CFO directly. If the conduct involves an executive officer, you may contact the Chairman of the Audit Committee of the Board. If you are asked to depart from this Code, whether by your supervisor, another Company Personnel, or anyone else, you must seek clarification and/or guidance as to the propriety of the actions in question from our CEO or CFO. You may also report known or suspected violations of the Code, or any violations of the laws, rules, regulations, or policies that apply to the Company, on the Ethics Helpline that is available 24 hours a day, 7 days a week at 844-416-5238; email AIMM@openboard.info or at http://www.openboard.info/AIMM/. Such reports will be reviewed by the Company's CEO or CFO and subsequently reported to the Audit Committee. You may remain anonymous and will not be required to reveal your identity in calls to the Ethics Helpline, although providing your identity may assist the Company in investigating your concern.

All reports of known or suspected violations of the law or this Code will be handled sensitively and with discretion, and the information will be disclosed to others only on a need to know basis and as required by law. Your manager or the Company's CFO, as applicable, will protect your confidentiality to the extent possible, consistent with applicable law and the Company's need to investigate your concern. Nothing in this Code or any Company policy or agreement prohibits you from: (i) reporting possible violations of state or federal laws or regulations that have occurred, are occurring, or are about to occur directly to the Company; or (ii) notifying the Company that you are going to make a report or disclosure to law enforcement.

There will be no adverse action taken and no discipline, discrimination, or retaliation is permitted against individuals who truthfully report known or suspected violations of the Code in good faith or who participate in the investigation. If the investigation leads to a conclusion that a material violation of the Code has occurred, the Company will take appropriate corrective action, which may include removal or dismissal from a position for a director or officer, dismissal for an employee, or a breach or termination of a contract or agreement for a Business Partner. Moreover, any supervisor who directs or approves of any conduct in violation of this Code, or who has knowledge of such conduct but does not immediately report it, will also be subjected to disciplinary action, which may include suspension or termination of employment.

We have assigned to our CFO overall accountability for tracking and responding to issues and questions relating to, and reported violations of, this Code. If our CFO receives information regarding an alleged violation of this Code, he or she or such other person authorized by the Board of Directors to investigate the alleged

violation will, as appropriate, (a) evaluate the information, (b) if the alleged violation involves an executive officer or a member of the Board of Directors, inform our CEO and Board of Directors of the alleged violation, (c) determine whether it is necessary to conduct an inquiry or investigation and, if so, conduct a reasonable inquiry or investigation as he deems to be appropriate, and (d) report the results of any inquiry or investigation, together with a recommendation as to disposition of the matter, to the appropriate executive officer or member(s) of our Board of Directors for action, or if the alleged violation involves an executive officer or a member of our Board of Directors, report the results of such inquiry or investigation to our Board of Directors.

65.    In the section entitled "Changes or Waivers," the Code of Ethics states:

There may be circumstances where a waiver of a provision of this Code is appropriate. Any request for a waiver should be in writing and should be directed to our CFO, who is responsible for maintaining a complete record of all requests for waivers to any of these policies and the disposition of those requests. No waiver will be effective unless it is in writing and is signed by our CFO or another authorized representative of Altimmune.

Any waiver of the Code for executive officers or members of the Board of Directors or any change to this Code that applies to executive officers or members of the Board of Directors may be made only by the Board of Directors or a board committee and will be disclosed as required by law or the rules of NASDAQ.

Any change or waiver of this Code for our directors, officers, or other senior members of the Company listed in Item 5.05 of Form 8-K may be made only by the Board of Directors and will be disclosed to the public as required by law or the rules of NASDAQ. Any waiver of this Code for other Company Personnel or Business Partners may be made by the Company's CEO or CFO and will be reported to our Audit Committee. Consents sought and obtained in accordance with the requirements of this Code are not considered waivers of the Code.

66.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Additionally, three of the Individual Defendants violated the Code of Ethics by engaging in lucrative insider trading while the Company's common stock price was artificially inflated as a result of the Individual Defendants breaching their fiduciary duties to the Company by causing the

Company to issue false and misleading statements. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

<b><u>ALTIMMUNE'S AUDIT COMMITTEE CHARTER</u></b>

67.    The Company also maintains a charter for the Audit Committee (the "Audit Committee Charter"). In the section entitled "Purpose," the Audit Committee Charter states that its purpose is to "assist the Board in fulfilling its oversight responsibilities" and that the Audit "Committee's primary duties and responsibilities are to oversee and monitor:"

- the integrity of the Company's financial statements;

- the Company's system of disclosure controls and procedures, internal control over financial reporting and other controls within its finance, accounting and legal compliance functions;

- the qualifications, independence and performance of the Company's independent registered public accounting firm (the "independent auditor");
- the performance of the Company's internal auditing function ("Internal Audit"), if and when established by the Company;

- the Company's compliance with legal and regulatory requirements (including U.S. securities laws); and

- risk assessment and risk management.

68.    Under the same section, the Audit Committee Charter continues with respect to the Audit Committee's purpose, stating, in relevant part:

> Consistent with these duties and functions, the Committee should provide an open avenue of communication among the independent auditor, financial and senior management, the Board and Internal Audit, as applicable. The Committee also should encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures and practices at all levels.

> The Committee has the authority to retain, at the Company's expense, special legal, accounting or other consultants or experts it deems necessary in the performance of

its duties and responsibilities. In addition, the Committee has the authority to conduct any investigation it deems necessary in fulfilling its duties and responsibilities.

The Committee will primarily fulfill its responsibilities by carrying out the activities enumerated in Section IV of this Charter. The Committee will report regularly to the Board regarding the execution of its duties and responsibilities.

69.     Under the section titled "Authority and Responsibilities," in the subsection titled

"Documents/Reports Review," the Audit Committee Charter states the following:

a)  The Committee shall review and discuss with management and the independent auditor the Company's annual audited financial statements and any relevant reports (including internal control reports) or other financial information submitted to any governmental body, or to the public, including the Company's Annual Report on Form 10-K and "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained therein and the management certifications as required by the Sarbanes-Oxley Act of 2002, prior to filing or distribution, including any certification, report, opinion or review rendered by the independent auditor. The Committee shall recommend to the Board whether the financial statements should be included in the Company's Annual Report on Form 10-K.

b)  The Committee shall review and discuss with management and the independent auditor the Company's quarterly consolidated financial results prior to the release of earnings, and the Company's quarterly consolidated financial statements on Form 10-Q, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained therein and the management certifications as required by the Sarbanes-Oxley Act of 2002, prior to filing or distribution.

c)  The Committee shall review the Company's quarterly earnings press release financial information (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information), as well as any earnings guidance released publicly.

70.     In the same section, under the subheading "Independent Auditor," the Audit

Committee Charter states the following:

a)  The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The independent auditor shall report directly to the Committee, and the Committee will oversee the resolution of disagreements

between management and the independent auditor regarding financial reporting, if they arise.

b) The Committee shall review the qualifications, independence and performance of the independent auditor.

c) The Committee, at least annually, shall obtain and review a formal written statement by the independent auditor describing all relationships between the independent auditor and the Company that, in the professional judgment of the independent auditor, may reasonably be thought to bear on their independence, consistent with the matters set forth in Public Company Accounting Oversight Board ("PCAOB") Rule 3526 or other applicable guidance. The Committee shall actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditor and take, or recommend that the Board take, appropriate action to oversee the independence of the independent auditor.

d) The Committee shall review and approve the independent auditor's audit plan and general audit approach, including audit fees, and, prior to the issuance of the annual audited financial statements, discuss the results of the audit with management and the independent auditor.

e) Following completion of the annual audit, the Committee shall review separately with each of management and the independent auditor any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information.

f) The Committee shall discuss with the independent auditor the matters required to be communicated to audit committees in accordance with Statement on Auditing Standards ("SAS") No. 1301, as amended by applicable guidance.

g) The Committee shall review the independent auditor's attestation and report on management's internal control report and hold timely discussions with the independent auditor regarding the following:

   i. critical accounting policies and practices;

   ii. alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the use of such alternate treatments, and the treatment preferred by the independent auditor; and

   iii. other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted audit differences.

h) The Committee shall review and pre-approve (which may be pursuant to pre-approval policies and procedures) both the audit and non-audit services to be provided by the independent auditor, taking into consideration whether the independent auditor's provision of non-audit services to the Company is compatible with maintaining the independent auditor's independence.

i) The Committee shall establish policies for hiring employees and former employees of the independent auditor, taking into consideration whether any such hiring policies are consistent with maintaining the independent auditor's independence.

j) The Committee shall monitor and ensure the rotation of partners of the independent auditor on the Company's engagement team as required by law.

71.     In the same section, under the subheading titled "Financial Reporting Processes, Accounting Policies and Internal Control Structure," the Audit Committee Charter states the following:

a) In consultation with management, the independent auditor and Internal Audit, as applicable, the Committee shall review the adequacy, effectiveness and integrity of the organization's financial reporting processes and internal control structure (including disclosure controls and procedures and internal controls over financial reporting).

b) The Committee shall receive and review any disclosure from the Company's Chief Executive Officer or Chief Financial Officer made in connection with the certification of the Company's quarterly and annual reports filed with the SEC of (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial data; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

c) The Committee shall review major issues regarding accounting principles and financial statement presentations, including:

   i. any significant changes in the Company's selection or application of accounting principles and the independent auditor's judgments about the quality and appropriateness of the Company's accounting principles as applied in its financial statements;

   ii. major issues as to the adequacy of the Company's internal controls; and

iii. any special audit steps adopted in light of such issues.

d) The Committee shall establish, maintain and oversee the Company's related-party transaction policy in compliance with applicable rules and regulations of the SEC; designate one or more individuals to serve as the Compliance Officer for purposes of screening potential related-party transactions; and review and, if acceptable, approve any related-party transactions pursuant to such policy.

e) The Committee shall establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential, anonymous submission by employees of the Company of complaints regarding questionable accounting or auditing matters and reviewing such complaints.

72.    In the same section, under the subheading "Internal Audit," the Audit Committee Charter states the following:

The Company shall, at its discretion, establish an Internal Audit department. If so established, the Committee will:

a) review and advise on the selection and removal of the Internal Audit director;

b) be directly responsible for the oversight of the work of the Internal Audit department, including the review of their budget, activities, organizational structure and qualifications;

c) periodically review with the Internal Audit director any significant difficulties, disagreements with management or scope restrictions encountered in the course of the function's work; and

d) regularly review the results of significant audits conducted by the Internal Audit department.

In the Company's discretion, the Internal Audit function may be outsourced to a third party vendor, provided that such vendor follows any standards and guidelines established by the Committee, and the Committee performs the oversight roles described above with respect to such vendor as though such vendor were the Company's Internal Audit department.

73.    In the same section, under the subheading "Ethical, Legal Compliance and Risk Management," the Audit Committee Charter states:

a)      The Committee shall annually prepare a report to shareholders as required by SEC rules, to be included in the Company's annual Proxy Statement.

b)      The Committee shall review and update periodically the Company's Code of Business Conduct and Ethics and related policies (collectively, the "Policies") and ensure that management has established a system to enforce these Policies.

c)      The Committee shall review management's monitoring of the Company's compliance with the Policies, and ensure that management has the proper review system in place for determining that the Company's financial statements, reports and other financial information disseminated to the SEC and the public satisfy legal requirements.

d)      The Committee shall periodically review, with the Company's counsel or Compliance Officer, legal compliance matters including corporate securities trading policies. At its discretion, the Board may determine to conduct the periodic review of legal compliance matters at the Board level, in lieu of, or in addition to, any review of such matters by the Committee.

e)      The Committee shall review with the Company's counsel any legal matter that could have a significant impact on the Company's financial statements. At its discretion, the Board may determine to conduct the periodic review of legal matters at the Board level, in lieu of, or in addition to, any review of such matters by the Committee.

f)      The Committee shall review and discuss policies with respect to risk assessment and risk management, including the steps management has taken to identify, monitor, control and report the Company's major financial risk exposures.

74.      In the same section, under the subheading "Other Matters," the Audit Committee

Charter states:

a)      The Committee shall review with the independent auditor, the Internal Audit department, if applicable, and management, the extent to which changes or improvements in financial or accounting practices have been implemented.

b)      The Committee shall perform a self-evaluation of the Committee's performance, considering responsiveness to this Charter, effectiveness of relationships and communications with management, the independent auditor, the Internal Audit department, if applicable, and the Board.

d)      The Committee, on an annual basis, shall review and reassess the adequacy of this Charter and recommend any proposed changes to the Board for approval.

c)      The Committee shall have the authority to engage legal counsel and other advisers, as the Committee determines necessary to carry out its duties.

d)      The Committee shall be directly responsible for setting the appropriate funding for the Company to pay compensation to any advisers employed by the Committee and to pay for ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

e)      The Committee shall have responsibility and authority to address such other matters as may be assigned or delegated to it by the Board from time to time.

While the Committee has the duties and responsibilities set forth in this Charter, the role of the Committee is oversight. The Committee is not responsible for planning or conducting the audit or determining whether the Company's financial statements are complete and accurate and in accordance with applicable accounting rules. Such activities are the responsibility of management and the Company's independent auditors. The Committee and its members are not preparers, auditors or certifiers of the Company's financial statements, or guarantors of the Company's independent auditors' reports. It is not the duty or responsibility of the Committee to ensure that the Company complies with all laws and regulations. The Committee and each of its members shall be entitled to rely on (a) the integrity of those persons and organizations within and outside of the Company from which it receives information, (b) the accuracy of the financial and other information provided to the Committee by such persons or organizations absent actual knowledge to the contrary (which shall be promptly reported to the Board) and (c) representations made by management as to any audit and non-audit services provided by the independent auditors to the Company.

75.      In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without

misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

76.     Altimmune is a clinical stage biopharmaceutical company focused on developing treatments for obesity and metabolic and liver diseases. The Company's leading product candidate, pemvidutide, is a novel investigational peptide-based GLP-1 and glucagon dual receptor agonist which the Company is developing to treat obesity and MASH.

77.     After announcing on August 10, 2023, that the MASH trial had begun enrollment, the Individual Defendants repeatedly represented to the investing public that the Company was eagerly awaiting trial results, which it anticipated would show pemvidutide's promise. However, by June 2025, the Company remained unable to substantiate its optimism. On June 26, 2025, the Company issued a press release announcing the MASH trial's topline results, which in fact indicated that of two primary endpoints for the trial, only one had been met: the fibrosis reduction endpoint showed no statistical significance.

## FALSE AND MISLEADING STATEMENTS

### *August 10, 2023 Press Release*

78.     The Relevant Period begins on August 10, 2023, when the Company issued a press release announcing its financial results for the second quarter of 2023 (the "Q2 2023 Press Release").

79.     The Q2 2023 Press Release also provided important business updates related to the Company's development of pemvidutide. Specifically, the Q2 2023 Press Release states:

> We are pleased to have commenced enrollment in our IMPACT Phase 2b biopsy-driven trial of pemvidutide in NASH," said Vipin K. Garg, Ph.D., President and

Chief Executive Officer of Altimmune. We believe our compelling Phase 1b data in subjects with nonalcoholic fatty liver disease (NAFLD) demonstrating class-leading improvements in liver fat and markers of liver inflammation support the prospects of achieving robust rates of NASH resolution and fibrosis improvement in our IMPACT trial. We are also eager to report our 48-week data from the MOMENTUM Phase 2 obesity trial next quarter. We believe the pemvidutide data showing significant weight loss, combined with robust reductions in liver fat content, serum lipids and blood pressure without cardiovascular safety signals could offer a differentiated product profile that meaningfully impacts patients with obesity and NAFLD or dyslipidemia, and patients with NASH.

80.    The Q2 2023 Press Release continued, discussing in greater depth the commencement of the IMPACT Phase 2b NASH trial stating in relevant part:

*Commenced enrollment in IMPACT Phase 2b NASH trial*

o   This Phase 2b biopsy-driven NASH trial is being conducted at approximately 60 sites in the U.S., with Dr. Stephen Harrison, Medical Director, Pinnacle Research, and Adjunct Professor of Medicine, Oxford University, serving as the principal investigator.

o   Approximately 190 subjects with and without diabetes are planned to be randomized 1:2:2 to 1.2 mg, 1.8 mg pemvidutide or placebo.

o   The key endpoints will be NASH resolution and fibrosis improvement after 24 weeks of treatment, with subjects followed for an additional 24 weeks for assessment of safety and additional biomarker responses.

o   Top-line results after 24 weeks of treatment are expected in the first quarter

***August 16, 2023 Proxy Statement***

81.    On August 16, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn solicited the 2023 Proxy Statement pursuant to Section 14(a) of the Exchange Act, and which contained materially false and/or misleading statements and omissions.

82.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer and Sohn to the Board; (2) ratify Ernst & Young LLP ("EY") as the Company's independent registered

public accounting firm for 2023; (3) approve on an advisory basis the compensation of the Company's named executive officers; (4) approve on an advisory basis the frequency of future advisory votes for named executive officer compensation; and (5) approve the authorization to adjourn the annual meeting if "necessary or advisable" to solicit proxies in favor of the foregoing proposals in case of insufficient votes to approve the foregoing proposals.

83.    Regarding the Board's oversight role, the 2023 Proxy Statement stated the following, in relevant part:

> The Company's management is responsible for defining the various risks facing the Company, formulating risk management policies and procedures, and managing the Company's risk exposures on a day-to-day basis. The Board's responsibility is to monitor the Company's risk management processes by informing itself of the Company's material risks and evaluating whether management has reasonable controls in place to address the material risks. The Board is not responsible, however, for defining or managing the Company's various risks.

> The Board of Directors monitors management's responsibility for risk oversight through regular reports from management to the Audit Committee and the full Board. Furthermore, the Audit Committee reports on the matters discussed at the committee level to the full Board. The Audit Committee and the full Board focus on the material risks facing the Company, including strategic, operational (including cybersecurity), legal and regulatory risks, to assess whether management has reasonable controls in place to address these risks. In addition, the Compensation Committee is charged with reviewing and discussing with management whether the Company's compensation arrangements are consistent with effective controls and sound risk management. Finally, risk management is a factor that the Board and the Nominating and Corporate Governance Committee consider when determining who to nominate for election as a director of the Company and which directors serve on the Audit Committee. The Board believes this division of responsibilities provides an effective and efficient approach for addressing risk management.

84.    Regarding the Code of Ethics, the 2023 Proxy Statement stated the following:

> The Board has adopted a Code of Business Conduct and Ethics (the "*Code of Ethics*") that applies to all officers, directors and employees and consultants. The Code of Ethics, as well as any amendments to, or waivers under, the Code of Ethics as it applies to the Company's officers, can be accessed in the *Investor Relations — Corporate Governance* section of our website at *www.altimmune.com*.

You may also obtain a copy of these documents by writing to Altimmune, Inc., 910 Clopper Road, Suite 201S, Gaithersburg, Maryland 20878, Attention: Investor Relations.

Copies of the charters of our Board's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee, as well as a copy of the Company's Corporate Governance Guidelines, can be accessed in the *Investor Relations — Corporate Governance* section of our website.

85. Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the confident remarks made prior to the publishing of the MASH trial results were not based in fact; (2) despite touting the success MASH trial, pemvidutide had shown no statistically significant results for one of its two primary endpoints; and (3) because of this failure, the Company's statements that it hoped for even better results in Phase 3 trials were not based in fact. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

86. The 2023 Proxy Statement was also materially false and/or misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Furthermore, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

87. As a result of Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn causing the 2023 Proxy Statement to be false and  misleading, the Company's shareholders vote to, *inter alia*: (1) re-elect Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue to breach their

fiduciary duties to the Company; (2) ratify the appoint of EY as the Company's independent registered public accounting company; (3) approve on an advisory basis the compensation of the Company's named executive officers; (4) approve on an advisory basis the frequency of future advisory votes for named executive officer compensation; and (5) approve the authorization to adjourn the annual meeting if "necessary or advisable" to solicit proxies in favor of the foregoing proposals in case of insufficient votes to approve the foregoing proposals.

### *November 7, 2023 Press Release*

88.    On November 7, 2023, Altimmune issued a press release announcing its financial results for the third quarter of 2023 (the "Q3 2023 Press Release").

89.    The Q3 2023 Press Release also provided business updates with respect to the IMPACT Phase 2b NASH trial, stating, in relevant part:

*Enrollment commenced in IMPACT Phase 2b NASH trial*

o   Informed by the positive results of the Phase 1b randomized, placebo-controlled trials of pemvidutide in subjects with non-alcoholic fatty liver disease (NAFLD), the FDA granted pemvidutide Fast Track designation for the treatment of NASH.

o   This Phase 2b biopsy-driven NASH trial is being conducted at approximately 60 sites in the U.S., with Dr. Stephen Harrison, Medical Director, Pinnacle Research, and Adjunct Professor of Medicine, Oxford University, serving as the principal investigator.

o   Approximately 190 subjects with and without diabetes are planned to be randomized 1:2:2 to 1.2 mg, 1.8 mg pemvidutide or placebo.

o   The key endpoints will be NASH resolution and fibrosis improvement after 24 weeks of treatment, with subjects followed for an additional 24 weeks for assessment of safety and additional biomarker responses.

o   Top-line results after 24 weeks of treatment are expected in the first quarter of 2025.

### *March 27, 2024 Press Release*

90.    On March 27, 2024, the Company issued a press release announcing its financial

results for the fourth quarter of 2023 as well as the full year (the "Q4 2024 Press Release").

91.    The Q4 2023 Press Release also provided a business update pertaining to the

MASH trial. Specifically, the Q4 2024 Press Release quoted Defendant Garg as stating, in relevant

part:

> We also remain excited about the outcome of our ongoing IMPACT Phase 2b
> MASH trial with topline 24-week data on the key endpoints of MASH resolution
> or fibrosis improvement anticipated in the first quarter of 2025. The results from a
> recently completed preclinical study demonstrating direct anti-fibrotic activity of
> pemvidutide only adds to our optimism about achieving a positive outcome in this
> trial.

***March 27, 2024 Earnings Call***

92.    That same day, the Company held an earnings call in which to discuss the fourth

quarter and year-end financial results.

93.    During the call, Defendant Garg explicitly represented that the Company had high

hopes for the outcome of the trial, stating, in relevant part:

> Turning to our Impact biopsy-driven Phase IIb MASH trial, we are looking forward
> to announcing the top line 24-week results anticipated in the first quarter of 2025.
> ***We are confident this trial will be successful considering the positive results from
> our 24-week Phase Ib trial of pemvidutide in subjects with NAFLD, where a
> greater than 75% relative reduction in liver fat content was achieved at the 1.8
> milligram and 2.4 milligram dosage at 24 weeks, along with robust reductions in
> ALT and cT1, both biomarkers of liver inflammation. A recently completed
> preclinical study demonstrating a direct anti-fibrotic activity of pemvidutide
> provides evidence of the potential second mechanism for reducing fibrosis in
> MASH patients.***[2]

***August 8, 2024 Press Release***

94.    On August 8, 2024, the Company issued a press release providing its financial

results for the second quarter of 2024 (the "Q2 2024 Press Release").

---

[2] All emphasis is added unless otherwise indicated.

95.    In its business update portion, the Q2 2024 Press Release discussed the MASH trial.

The Q2 2024 Press Release quoted Defendant Garg as stating, in relevant part:

> During the second quarter, we continued to highlight the scientific evidence supporting the robust therapeutic potential of pemvidutide in metabolic diseases. ***The data presented at the European Association for the Study of the Liver (EASL) meeting highlighted the disease-modifying potential of pemvidutide in MASH and reinforces our confidence in achieving success on the MASH resolution and fibrosis improvement endpoints of our Phase 2b IMPACT trial.*** We also delivered two podium presentations at the American Diabetes Association (ADA) 84th Scientific Sessions that highlighted the robust reductions in body weight and serum lipids with pemvidutide treatment. In addition, we presented data demonstrating class-leading preservation of lean mass among incretin agents, an increasingly important consideration in the treatment of obesity. These data further exemplify the differentiation and broad utility we believe pemvidutide will bring to the rapidly evolving obesity marketplace. We continue to make progress toward expanding the development of pemvidutide in up to three additional indications where its dual GLP-1/glucagon agonism could provide benefit over currently available agents. In parallel with these efforts, our discussions with potential strategic partners continue to progress. We look forward to sharing further updates on each of these initiatives.

### *August 8, 2024 Earnings Call*

96.    That same day, Altimmune held an earnings call to discuss its fiscal results for the second quarter of 2024.

97.    During the earnings call, Defendant Harris stated the following regarding the MASH trial, in relevant part:

> Turning to MASH. ***We presented data at the EASL Congress from a quantitative model that would predict a high likelihood of success in the upcoming IMPACT trial.*** In addition, an analysis of data in our Phase 1 trial of metabolic-associated steatotic liver disease, also known as MASLD, demonstrated that higher proportions of subjects receiving pemvidutide achieved improvements in FibroScan-aspartate aminotransferase or FAST score, MRI-PDFF and alanine aminotransferase compared with subjects receiving placebo. ***This suggests that significant rates of mass resolution and fibrosis improvement may be achieved in the IMPACT Phase 2b MASH trial***. We also presented data on the ability of pemvidutide the lower serum lipid species associated with dyslipidemia in MASH, which reminds us that cardiovascular benefits of the primary cause of mortality in match patients.
>
> In addition, we recently published our results from the 12-week trial of pemvidutide in MASLD, metabolic associated liver disease in the Journal of Hepatology, establishing the differentiated effects of pemvidutide in the treatment of MASLD

and MASH. The safety and tolerability profile of pemvidutide was highlighted by the low 2.9% rate of adverse event discontinuations in this trial. With respect to impact, our enrollment is progressing well. If the 24-week efficacy endpoints are achieved, we believe the results could be transformative for the MASH therapeutic space as we would demonstrate for the first time with rapid improvement in mass resolution and fibrosis improvement with an incretin agent in a 24-week time frame.

***August 15, 2024 Proxy Statement***

98.     On August 15, 2024, the Company filed on Schedule 14A with the SEC its annual proxy statement for 2024 (the "2024 Proxy Statement"). Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn solicited the 2024 Proxy Statement pursuant to Section 14(a) of the Exchange Act, and which contained materially false and/or misleading statements and omissions.

99.     The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board; (2) ratify EY as the Company's independent registered public accounting firm for 2024; (3) approve on an advisory basis the compensation of the Company's named executive officers; and (4) approve the authorization to adjourn the annual meeting if "necessary or advisable" to solicit proxies in favor of the foregoing proposals in case of insufficient votes to approve the foregoing proposals.

100.    Regarding the Board's oversight role, the 2024 Proxy Statement stated the following, in relevant part:

The Company's management is responsible for defining the various risks facing the Company, formulating risk management policies and procedures, and managing the Company's risk exposures on a day-to-day basis. The Board's responsibility is to monitor the Company's risk management processes by informing itself of the Company's material risks and evaluating whether management has reasonable controls in place to address the material risks. The Board is not responsible, however, for defining or managing the Company's various risks.

The Board of Directors monitors management's responsibility for risk oversight through regular reports from management to the Audit Committee and the full Board. Furthermore, the Audit Committee reports on the matters discussed at the

committee level to the full Board. The Audit Committee and the full Board focus on the material risks facing the Company, including strategic, operational (including cybersecurity), legal and regulatory risks, to assess whether management has reasonable controls in place to address these risks. In addition, the Compensation Committee is charged with reviewing and discussing with management whether the Company's compensation arrangements are consistent with effective controls and sound risk management. Finally, risk management is a factor that the Board and the Nominating and Corporate Governance Committee consider when determining who to nominate for election as a director of the Company and which directors serve on the Audit Committee. The Board believes this division of responsibilities provides an effective and efficient approach for addressing risk management.

101.    Regarding the Code of Ethics, the 2024 Proxy Statement stated the following:

The Board has adopted a Code of Business Conduct and Ethics (the "*Code of Ethics*") that applies to all officers, directors and employees and consultants. The Code of Ethics, as well as any amendments to, or waivers under, the Code of Ethics as it applies to the Company's officers, can be accessed in the *Investor Relations — Corporate Governance* section of our website at *www.altimmune.com*.

You may also obtain a copy of these documents by writing to Altimmune, Inc., 910 Clopper Road, Suite 201S, Gaithersburg, Maryland 20878, Attention: Investor Relations.

Copies of the charters of our Board's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee, as well as a copy of the Company's Corporate Governance Guidelines, can be accessed in the *Investor Relations — Corporate Governance* section of our website.

102.    Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn caused the 2024 Proxy Statement to be false and misleading by failing to disclose, inter alia, that: (1) the confident remarks made prior to the publishing of the MASH trial results were not based in fact; (2) despite touting the success MASH trial, pemvidutide had shown no statistically significant results for one of its two primary endpoints; and (3) because of this failure, the Company's statements that it hoped for even better results in Phase 3 trials were not based in fact. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

182.    The 2024 Proxy Statement was also materially false and misleading because,

despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Furthermore, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

103.    As a result of Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn causing the 2024 Proxy Statement to be false and  misleading, the Company's shareholders vote to, *inter alia*: (1) re-elect Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify EY as the Company's independent registered public accounting firm for 2023; (3) approve on an advisory basis the compensation of the Company's named executive officers; and (4) approve the authorization to adjourn the annual meeting if "necessary or advisable" to solicit proxies in favor of the foregoing proposals in case of insufficient votes to approve the foregoing proposals.

### November 12, 2024 Press Release

104.    On November 12, 2024, the Company issued a press release in which it discussed its financial results for the third quarter of 2024 (the "Q3 2024 Press Release"). The Q3 2024 Press Release quoted Defendant Garg as stating, *inter alia*, that:

> In the third quarter, we reached several important milestones, most notably the completion of enrollment in the Phase 2b IMPACT trial of pemvidutide in MASH, positioning us to report top-line efficacy data in the second quarter of 2025.Further, we successfully completed our End-of-Phase 2 meeting with the FDA for the pemvidutide Phase 3 obesity program, gaining agreement on the design of the pivotal studies as well as the measures of efficacy and safety.

### November 12, 2024 Earnings Call

105.    That same day, on November 12, 2024, the Company hosed an earnings call to discuss the third quarter results.

106.    During the call, the Individual Defendants discussed business updates, most notably those pertaining to the MASH trial. During this update, Defendant Garg stated, in relevant part:

> Upon a positive data readout from Phase IIb IMPACT trial in the second quarter of 2025, we expect to be ready to start a Phase III program in MASH by the end of next year. We continue to believe that pemvidutide is a highly differentiated agent from others and in strategically important ways, relative to the current metabolic disease landscape.

### February 27, 2025 Press Release

107.    On February 27, 2025, the Company issued a press release in which it reported its financial results for the fourth quarter of 2024 as well as the full year (the "Q4 2024 Press Release"). The Q4 2024 Press Release quoted Defendant Garg as stating the following regarding the MASH trial, in relevant part:

> 2024 was a year of important progress for Altimmune as we continued to advance pemvidutide in multiple indications. As announced previously, we completed enrollment of the IMPACT Phase 2b trial of pemvidutide in MASH and are on track to report top-line data in the second quarter of 2025. IMPACT was one of the fastest enrolling biopsy-driven Phase 2b MASH trials, which we believe reflects the attractiveness of pemvidutide to patients and providers, specifically the compound's potent reduction of both liver fat and body weight. Based on the totality of the data generated to date, including multiple non-invasive biomarkers of liver inflammation and fibrosis, we are confident that pemvidutide will achieve statistically significant improvements in biopsy endpoints, both MASH resolution and fibrosis improvement, at trial readout. We anticipate holding an end-of-Phase 2 meeting with FDA by the end of 2025 to gain alignment on the registrational Phase 3 program.

### May 13, 2025 Press Release

108.    On May 23, 2025, Altimmune issued a press release in reporting its financial results for the first quarter of 2025 (the "Q1 2025 Press Release").

109.    The Q1 2025 Press Release also provided a business updated regarding the MASH trial. The Q1 2025 Press Release stated, in relevant part:

*Top-line data from the IMPACT Phase 2b trial of pemvidutide in biopsy-confirmed*
*F2/F3 MASH expected in Q2 2025*

- o   Top-line data is expected to include rates of MASH resolution and fibrosis improvement, weight loss, non-invasive tests, and data on safety and tolerability.

- o   A total of 212 participants were randomized, exceeding the 190 originally planned.

- o   If successful, pemvidutide would be the first investigational therapy in MASH to achieve statistical significance in both MASH resolution and fibrosis improvement, as well as demonstrate meaningful weight loss, after only 24 weeks of treatment.

110.    The foregoing statements in ¶¶ 78-80, 88-97, and 104-109 were materially false and/or misleading and/or failed to properly disclose material adverse information when made because, inter alia: (1) the confident remarks made prior to the publishing of the MASH trial results were not based in fact; (2) despite touting the success MASH trial, pemvidutide had shown no statistically significant results for one of its two primary endpoints; and (3) because of this failure, the Company's statements that it hoped for even better results in Phase 3 trials were not based in fact. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

111.    The truth emerged on June 26, 2025, when Altimmune published a press release announcing the topline results from the IMPACT Phase 2b pemvidutide trial for the treatment of MASH. The press release stated, in relevant part:

- In an ITT analysis, MASH resolution without worsening of fibrosis was achieved in 59.1% and 52.1% of participants treated with pemvidutide 1.2 mg and 1.8 mg, respectively, vs. 19.1% of participants treated with placebo (p< 0.0001, both doses).

- In an additional ITT analysis, fibrosis improvement without worsening of MASH was achieved in 31.8% and 34.5% of participants treated with

pemvidutide 1.2 mg and 1.8 mg vs. 25.9% of participants treated with placebo (differences not significant).

- A supplemental AI-based analysis demonstrated statistically significant reductions in fibrosis, which included 30.6% of participants receiving pemvidutide 1.8 mg achieving a 60% or more reduction in fibrosis compared to 8.2% receiving placebo (p< 0.001). Pemvidutide-treated participants also achieved statistically significant reductions in non-invasive tests of fibrosis (ELF and VCTE) and inflammation (alanine aminotransferase, ALT).

- A total of 25.8% and 24.1% of participants receiving pemvidutide 1.2 mg and 1.8 mg, respectively, achieved the stringent endpoint of MASH resolution and fibrosis improvement versus 13.5% in participants receiving placebo (differences not significant).

- Participants receiving pemvidutide 1.2 mg and 1.8 mg achieved weight loss of 5.0% and 6.2% vs. 1.0% in placebo (p< 0.001), with the trajectory showing no plateauing at 24 weeks.

- Liver fat reductions of 58.0% and 62.8% were achieved in participants who received pemvidutide 1.2 mg and 1.8 mg, respectively, vs. 16.2% in participants who received placebo (p< 0.001, both doses).

- AEs leading to treatment discontinuation were 0.0% and 1.2% for pemvidutide 1.2 mg and 1.8 mg, respectively, vs. 2.4% in participants on placebo.

- No SAEs related to study drug or arrhythmias were reported at 24 weeks.

- Glycemic control was maintained with minimal changes in HbA1C regardless of diabetic status

112.     That same day, Altimmune hosted a special call with analysts and investors in which it addressed the topline results from the MASH trial. Defendant Harris spoke during this call, and provided the Company's official analysis of the results. In relevant part, Defendant Harris stated:

> ***The next slide shows the fibrosis improvement data based on pathologist reads using the ITT method. Although we saw positive trends in fibrosis improvement, statistical significance was not achieved on this endpoint.*** We'll dig into this further on the next slide.

On the next slide, we compare these fibrosis improvement rates to other studies. The 34.5% absolute fibrosis improvement observed for pemvidutide at 1.8 milligrams was similar to other candidates, ***but the achievement of statistical significance was impaired by the higher-than-expected placebo response. The magnitude of the treatment effect on a placebo-adjusted basis was not dissimilar to that observed with other compounds. Based on the additional analysis that I'm about to show you, it is our believe that these effects, which were observed at only 24 weeks of treatment have the potential to amplify over time and that statistical significance could potentially have been achieved at week 48.***

\* \* \*

The next slide shows the composite endpoint of patients achieving both MASH resolution and fibrosis improvement. As shown, when more stringent endpoints are employed, the placebo response, which appeared are achieving statistical significance on the fibrosis improvement endpoint was minimized. In fact, in this analysis, the pemvidutide response was almost twice that observed with placebo and approached statistical significance with a P value of 0.07 at the 1.8 milligram dose. ***It is important to note that resmetirom and semaglutide, 2 drugs that are either approved or on the verge of approval for MASH, failed to meet statistical significance on the fibrosis improvement endpoint in Phase II trials, but met them in Phase III.***

***In the case of resmetirom, success was achieved by extending the duration of treatment from 36 to 48 weeks, allowing the fibrosis improvement response further time to develop. And in the case of semaglutide by the reduction of the placebo response inherent when large number of subjects are studied as when Phase III studies are conducted.***

113.     During the question-and-answer portion of the call, analysts asked the Individual Defendants questions with respect to the MASH clinical trial results. Analyst Emma Nesson of Piper Sandler & Co. engaged in the following exchange with Defendant Harris:

<Q: Emma Nesson - Piper Sandler & Co. – Research Analyst> This is Emma, on for Yas. I guess we're wondering that beyond the larger size in a Phase III and duration, what are some things you can do to mitigate the placebo response in the Phase III? And do you think that there is an opportunity for the regulatory like landscape to shift towards maybe accepting AI-based histological analyses?

<A: Defendant Harris> Thanks, Emma. Well, obviously, we have one very successful strategy here, which is the placebo response will go down in Phase III. We're also looking for additional methods to control the placebo response given the biopsy reads. Obviously, more stringent endpoints like the one that was shown in the presentation will also improve the treatment effect.

114.    In short, the Individual Defendants, in explaining the results of the MASH trial, directly contradicted their prior statements in press releases and earlier earnings calls. Whereas previously the Individual Defendants had assured investors and analysts that the Company's expectations were high, they were now forced to concede that Altimmune failed to account for high placebo responses during the study, leading to the critical miss of the fibrosis reduction primary endpoint. Now, attempting to explain this discrepancy in the face of questions from the investing public, the Individual Defendants could do no more than state their hope that the Phase 3 trial would successfully achieve the statistical significance endpoint.

115.    Investors and analysts reacted swiftly and negatively to this about-face. Several well-known analysts who had been reporting on Altimmune issued negative ratings for the Company in the wake of these disclosures. In a report title "Not the Monster MASH investors were looking for as high PBO rates cloud signal," Evercore ISI stated, in relevant part:

> Altimmune reported MASH biopsy data from the P2b IMPACT study for pemvidutide, showing 9% reduction in fibrosis at 6 months, net of the high placebo rate of 26%, not statistically significant, p-value not disclosed. A slower response than FGF21's but perhaps not inconsistent with other MOAs/drugs including Rezdiffra, semaglutide and survodutide (which was the same MOA). MASH resolution rate of 33% at the higher dose (40% at the low dose) net of placebo was statistically significant & sandwiched between FGF ETNB's pegozafermin and AKRO's efruxifermin, a decent outcome. Weight loss reached the high end of our expectations coming in at 5.2% net of placebo, at the higher dose with no signs of plateauing. Low single digit discontinuation rate suggests good tolerability. Importantly safety continues to look good with no material increase in heart rate, an AE of special interest for glucagon containing medicines like pemvidutide.

116.    The results Altimmune reported similarly failed to impress William Blair, who referred to them as "underwhelming," in his less-than-laudatory assessment, stating, in relevant part:

> Overall, given the lack of fibrosis improvement at the 24-week primary endpoint and the limited ability, in our view, to demonstrate stringent fibrosis improvement at the 48-week time point (no liver biopsy will be conducted), we believe the results are underwhelming. In addition, we view the weight loss magnitude at 24 weeks as

non-differentiating. We therefore reiterate our Market Perform rating, and we provide more detailed thoughts in the note below.

* * *

While the Phase IIb IMPACT study met the MASH resolution endpoint, we believe investors are considerably more interested in the other primary endpoint of fibrosis improvement, which has been demonstrated to correlate with reduced progression to cirrhosis, liver failure, development of hepatocellular carcinoma, and mortality.

117.    On this news, the price per share of the Company's common stock fell $4.10, or 53.2%, from a closing price of $7.71 on June 25, 2025 to $3.61 on June 26, 2025.

## DAMAGES TO ALTIMMUNE

118.    As a direct and proximate result of the Individual Defendants' conduct, Altimmune has lost and will continue to lose and expend many millions of dollars.

119.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

122.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

123.    As a direct and proximate result of the Individual Defendants' conduct, Altimmune has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

124.    Plaintiff brings this action derivatively and for the benefit of Altimmune to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Altimmune, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

125.    Altimmune is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

126.    Plaintiff is, and has been at all relevant times, a shareholder of Altimmune. Plaintiff will adequately and fairly represent the interests of Altimmune in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Altimmune's Board consisted of the following ten individuals: Defendants Garg, Gill, Jorkasky, Hodges, Pisano, Sayare, Schafer, and Sohn (collectively, the "Director-Defendants"), and non-parties Jerome Durso and Teri Lawver (together, with the Director-Defendants, the

"Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

129.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

130.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Altimmune to issue materially false and misleading statements. Specifically, the Director-Defendants caused Altimmune to issue false and misleading statements which were intended to make Altimmune's business appear more profitable and stable to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

131.    Additional reasons that demand on Defendant Garg is futile follow. Defendant Garg has served as a director of the Company, as well as its CEO and President, since 2018. As such, the Company provides Defendant Garg with his principal occupation, for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant Garg was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including those which he personally made himself. As the Company's highest officer and a trusted Company

director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Garg also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect himself and Defendants Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Garg solicited  the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to reelect himself and Defendants Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Garg's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates his motive to participate in the scheme. Moreover, Defendant Garg is a defendant in the Securities Class Action. For these reasons, Defendant Garg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Gill is futile follow. Defendant Gill has served as a Company director since August 2004. He also currently serves as a member of the Nominating and Corporate Governance Committee, as well as the Audit Committee. Defendant Gill has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his

duties to protect corporate assets. Defendant Gill also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Drutz, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Gill solicited the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Gill breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Hodges is futile follow. Defendant Hodges has served as a Company director since May 2017. He also currently serves as  Chair of the Audit Committee, and as a member of the Compensation Committee. Defendant Hodges has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Hodges also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Drutz, Gill, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Gill solicited the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to reelect himself and

Defendants Garg, Gill, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.  For these reasons, Defendant Hodges breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Jorkasky is futile follow. Defendant Jorkasky has served as a Company director since May 2020. She also serves as a member of the Compensation Committee. Defendant Jorkasky has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Jorkasky also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect herself and Defendants Garg, Drutz, Gill, Hodges, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Jorkasky solicited the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to reelect herself and Defendants Garg, Gill, Hodges, Pisano, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Jorkasky breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Pisano is futile follow. Defendant Pisano has served as a Company director since August 2018. He also serves as the Chair of the

Nominating and Corporate Governance Committee. Defendant Pisano has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Pisano also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Pisano solicited the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Gill, Hodges, Jorkasky, Sayare, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Pisano breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Sayare is futile follow. Defendant Sayare has served as a Company director since April 2010. Defendant Sayare also serves as a member of the Audit Committee, and previously served as the Board's Chairman from January 2018 until August 2025. Defendant Sayare has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Sayare

also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Sayare solicited the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Schafer, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.  For these reasons, Defendant Sayare breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Schafer is futile follow. Defendant Schafer has served as a Company director since May 2018. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Schafer also previously served as a director Altimmune prior to its merger in 2017, when the Company was still private. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Schafer also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect himself and Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Schafer solicited the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to

reelect himself and Defendants Gill, Hodges, Jorkasky, Pisano, Sayare, and Sohn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Schafer breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Sohn is futile follow. Defendant Sohn has served as a Company director since March 2023. She also serves as a member of the Nominating and Corporate Governance Committee and as Chair of the Compensation Committee. Defendant Sohn has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Sohn also solicited the 2023 Proxy Statement, which contained false and misleading information that contributed to, *inter alia*, shareholders voting to reelect herself and Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, and Schafer to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Sohn solicited the 2024 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to reelect herself and Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, and Schafer to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Sohn breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

139.    Additional reasons that demand on the Board is futile follow.

140.    Defendants Gill, Hodges, Sayare, and Schafer (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

141.    In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

142.    Altimmune has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Altimmune any part of the damages Altimmune suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

143.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

144.    The acts complained of herein constitute violations of fiduciary duties owed by Altimmune's officers and directors, and these acts are incapable of ratification.

145.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Altimmune. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Altimmune, there would

be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

146.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Altimmune to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

147.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

150.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

151.    Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn caused the 2023 Proxy Statement to be false and/or misleading by failing to disclose, *inter alia*, that: (1) the confident remarks made prior to the publishing of the MASH trial results were not based in fact; (2) despite touting the success MASH trial, pemvidutide had shown no statistically significant results for one of its two primary endpoints; and (3) because of this failure, the Company's statements that it hoped for even better results in Phase 3 trials were not based in fact. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

152.    Moreover, the 2023 Proxy Statement failed to disclose that the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and/or omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Furthermore, the 2023 Proxy Statement was materially false and/or misleading because, despite assertions to the contrary, the board was not adequately performing its risk oversight functions.

153.    Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and/or misleading. The misrepresentations and omissions were material to Plaintiff in voting on the

matters set forth for shareholder determination in the 2023 Proxy Statement, including, but not limited to, the re-election of directors.

154.    As a result of Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn causing the 2023 Proxy Statement to be false and/or misleading, the shareholders voted to, *inter alia*, re-elect Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby enabling them to continue to breach their fiduciary duties to the Company.

155.    The Company was damaged as a result of Defendants Garg, Drutz, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn making material misrepresentations and omissions in the 2023 Proxy Statement.

156.    Additionally, Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn caused the 2024 Proxy Statement to be false and/or misleading by failing to disclose, *inter alia*, that: (1) the confident remarks made prior to the publishing of the MASH trial results were not based in fact; (2) despite touting the success MASH trial, pemvidutide had shown no statistically significant results for one of its two primary endpoints; and (3) because of this failure, the Company's statements that it hoped for even better results in Phase 3 trials were not based in fact. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

157.    Moreover, the 2024 Proxy Statement failed to disclose that the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and/or omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Furthermore, the 2024 Proxy

Statement was materially false and/or misleading because, despite assertions to the contrary, the board was not adequately performing its risk oversight functions.

158.    Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and/or misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the re-election of directors.

159.    As a result of Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn causing the 2024 Proxy Statement to be false and/or misleading, the shareholders voted to, *inter alia*, re-elect Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn to the Board, thereby enabling them to continue to breach their fiduciary duties to the Company.

160.    The Company was damaged as a result of Defendants Garg, Gill, Hodges, Jorkasky, Pisano, Sayare, Schafer, and Sohn making material misrepresentations and omissions in the 2024 Proxy Statement.

161.    Plaintiff, on behalf of Altimmune, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Altimmune's business and affairs.

185.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

186.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Altimmune.

187.     Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Altimmune's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*: (1) the confident remarks made prior to the publishing of the MASH trial results were not based in fact; (2) despite touting the success MASH trial, pemvidutide had shown no statistically significant results for one of its two primary endpoints; and (3) because of this failure, the Company's statements that it hoped for even better results in Phase 3 trials were not based in fact. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

188.     The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

189.     Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

190.     In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's common stock was still trading at artificially inflated prices before the fraud was

exposed, Defendants Garg, Harris, and Drutz engaged in lucrative insider sales of Company common stock, netting combined proceeds of approximately $842,274.

191.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

192.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

193.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Altimmune has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff, on behalf of Altimmune, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Altimmune.

198.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Altimmune that was tied to the performance or artificially inflated valuation of Altimmune or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

199.    Plaintiff, as a shareholder and representative of Altimmune, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

200.    Plaintiff, on behalf of Altimmune, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Abuse of Control**

201.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Altimmune, for which they are legally responsible.

203.    As a direct and proximate result of the Individual Defendants' abuse of control, Altimmune has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204.    Plaintiff, on behalf of Altimmune, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

205.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Altimmune in a manner consistent with the operations of a publicly held corporation.

207.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Altimmune has sustained and will continue to sustain significant damages.

208.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff, on behalf of Altimmune, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

212.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

213.    Plaintiff, on behalf of Altimmune, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Garg and Harris for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

214.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.    Altimmune, Defendant Garg, and Defendant Harris are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the willful and/or reckless violations of their obligations as officers and/or directors of Altimmune by Defendants Garg and Harris.

216.    Defendants Garg and Harris, because of their positions of control and authority as officers and/or directors of Altimmune, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Altimmune, including the wrongful acts complained of herein and in the Securities Class Action.

217.    Accordingly, Defendants Garg and Harris are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

218.    As such, Altimmune is entitled to receive all appropriate contribution or indemnification from Defendants Garg and Harris.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Altimmune, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Altimmune;

(c)    Determining and awarding to Altimmune the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Altimmune and the Individual Defendants to take all necessary actions to reform and improve Altimmune's corporate governance and internal procedures to comply with applicable laws and to protect Altimmune and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Altimmune to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Altimmune restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 29, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 5749B396-BBA1-400C-BCC6-5EC74CE56498

## **VERIFICATION**

      I, Musa Alaraidah, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of September, 2025.

Signed by:

*Musa Alaraidah*

F3FC70304016423

Musa Alaraidah